LAW OFFICES

# KING & KING LLP

THE SANBORN MAP BUILDING
**629 Fifth Avenue – Suite 113**
**Pelham, N.Y. 10803**
**914-380-5970**
**e-mail: pkutil@king-king-law.com**

**Peter M. Kutil**
_____

Sanborn & King (1865 – 1872)
George A. King (1855-1938)
William B. King (1861-1930)

February 27, 2017

**VIA ECF**

Magistrate Judge Vera M. Scanlon
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:    Scottsdale Insurance Company v. Bo Steel Group Inc. et al.
>         EDNY Index No. 1:14-cv-07318-AMD-VMS

Dear Judge Scanlon:

The undersigned and this firm represent defendants KSK Construction Group ("KSK") and Sevenberry Construction LLC, and pursuant to the subject Liquidation Agreement at issue, also Bo Steel Group Inc. ("Bo Steel").

I write in response to the February 21, 2017 "Letter Motion to Strike Notice of Appearance on behalf of Bo Steel and that the Liquidation Agreement is without force and effect" filed by counsel for Gary G Emanuel Brokerage, Inc. ("Emanuel Brokerage"). Counsel for Emanuel Brokerage (Mr. Babchik) argues (without being personally present) that at the recent Court conference on February 16, 2017, I had "conceded that Mr. Olazabal did not have actual authority, and instead claimed that he had 'apparent authority' to sign the [Liquidation or Liquidating] Agreement." Counsel Babchik also argues and concludes that "absent a showing by Sevenberry and/or its counsel, that it made reasonable inquiry of Mr. Chen to determine Mr. Olazabal's authority to enter the Liquidating Agreement, the Agreement should be invalidated and Mr. Kutil [the undersigned's] Notice of Appearance struck."

Several points in response:

## I.    Counsel for Emanuel Brokerage or his client does not have standing

First, and as an initial matter, counsel for Emanuel Brokerage or his client does not have standing to question Sevenberry's or Bo Steel's retention of its counsel of choice. There is no allegation of any conflict of interest or any impropriety. Counsel's only argument is lack of corporate authority; but, he cites to no case where an adversary has challenged opposing counsel's hire based on a challenge of corporate authority. And, whether there was "actual authority" or

"apparent authority" in Bo Steel's or Sevenberry's hire of its counsel, such issue has no bearing on any other document or paper in this case.

Simply, I am not aware of any instance in this case where Bo Steel had at any time sought to disclaim or in any way distance itself from the documents signed by Mr. Olazabal or by Mr. Chen. There is no issue in this case where "actual authority" or "apparent authority" is relevant to the words used or binding nature of any contracts or documents in this case. Basically, the question of authority is not an issue in this case, and counsel Babchik's effort or motivation to challenge another counsel's practice or due diligence related to attorney-client communication is difficult to understand or comprehend. I am hesitant to divulge <u>any</u> communications with my clients or make <u>any</u> showing regarding my representation and hire, and ask that before such showing is required of me or my clients, that I do so ex-parte, if the Court so requires it. However, again, counsel Babchik or his client simply have no standing. See, <u>Ardsley Construction Company, Inc. v. The Port of New York Authority</u>, 61 A.D.2d 953, 403 N.Y.S. 2d 43, 44 (1st Dep't. 1978) ("[An] agreement between plaintiffs and the [damaged party] with respect to any recovery from defendant affects only the relationship between plaintiffs and [the damaged party] and should not be available to defendant as a shield against liability…").

In addition, the cases cited and relied on by movant have nothing to do with the issue at hand. None of the cases relate to the issue whether or to what extent a party or its attorney may inquiry into another party's corporate authority related to its retention of counsel.

## II. Mr. Olazabal had actual authority to sign the Liquidation Agreement

Second, assuming standing exists, counsel Babchik is incorrect in his statements that at conference on February 16, 2017 that I conceded that Mr. Olazabal had no actual authority to sign the Liquidation Agreement. Counsel Babchik was not present at the conference. And, I recall no such statement. Without the benefit of a transcript, I recall stating that the use of liquidation agreements is not unusual in the construction industry, and that Sevenberry now stands in the shoes of Bo Steel. I also recall that the issue of whether I would submit a notice of appearance was specifically discussed, and that this issue was ruled upon by the Court when the prior Bo Steel default was vacated by the Court, based on my representation that I would submit such notice of appearance forthwith. Which I did (Docket Entry No. 87, filed on 2/16/17). Counsel Babchik makes no mention of the Court's prior ruling. Yet, he mis-states, without being personally present at the conference, that somehow I had "conceded" Mr. Olazabal's corporate capacity or status. Again, I disagree.

Counsel is also incorrect in his assessment that Mr. Olazabal was not authorized to sign agreements on behalf of Bo Steel. Mr. Olazabal was so authorized, and he so testified. Counsel Babchik's quotations of Mr. Olazabal's testimony that Mr. Olazabal had "played" as the "president"

is selective, and misses the testimony at pages 21 line 4, 27 line 7 and 56 line 25 of the transcript, where Mr. Olazabal had testified that he was authorized to sign documents on Bo Steel's behalf:

> Q: Did you have, in 2012, authority to execute contracts on behalf of Bo Steel?
> A: Yes.
> * * *
> Q: You indicated previously that you had authority to enter into contracts for Bo Steel?
> A: Yes.
> Q: Did that include construction contracts?
> A: Yes.

Transcript of pages 21 and 24 are attached hereto at **Exhibit A**. And, the statement at transcript page 56, submitted by Mr. Babchik also confirm that Mr. Olazabal had authority to sign contracts on behalf of Bo Steel:

> Q: But you were authorized by your father-in-law to sign this document?
> [Objection]
> Mr. Suri: Asked and Answered. He said several times he is authorized to sign contracts.
> Ms. Angelino: He has given inconsistent testimony.
> Q: You signed as president of Bo Steel, correct?
> A: Yes, I did.

Transcript of page 56 is attached as **Exhibit A** to counsel Babchik's letter.

Also, at **Exhibit B** hereto is a copy of the subcontract between Bo Steel and Sevenberry signed by Mr. Olazabal on behalf of Bo Steel. Accordingly, just as Mr. Olazabal was authorized to sign the underlying subcontract, he was also authorized to sign the Liquidation Agreement, which is essentially a modification to the underlying subcontract. And, again, there is no issue in this case that seeks to question or relates to the validity of this subcontract or any other document.

Counsel's quotations of Mr. Olazabal's testimony also may miss the nuance of the term "play," as bi-lingual speakers (such as Mr. Olazabal) may not appreciate the dual meaning of such wording.

### III.   The Liquidation Agreement conforms to case law, and the undersigned's representation of Bo Steel in this case is pursuant to such terms

Third, the issues raised by counsel Babchik compounds two separate issues: (1) propriety of my and my firm's representation of Bo Steel per the Liquidation Agreement, and (2) inquiry whether my representation is also a more conventional attorney-client retention, such as that previously

existing between Mr. Vivek Suri, Esq., Bo Steel's prior counsel and Bo Steel. I note that Mr. Babchik did not object to Mr. Suri's representation previously, if in fact he had any legitimate concerns about Mr. Olazabal's authority to hire Mr. Suri after Mr. Olazabal's deposition on May 11, 2016, almost ten months ago.

To the extent that the terms of the Liquidation Agreement are at issue, I highlight that portion that specifically allowed Sevenberry to prosecute Bo Steel's claims and defenses in Bo Steel's name. Specifically, at paragraph 4 of the Liquidation Agreement, it states that "Bo Steel authorizes Sevenberry to prosecute the claims and defenses in the Scottsdale action through such counsel as Sevenberry may choose, in the name of Bo Steel." It also states that same counsel may represent both, Sevenberry and Bo Steel. A copy of the Liquidation Agreement was attached to the notice of appearance (Docket Entry No. 87, filed on 2/16/17), and is also attached hereto at **Exhibit C**.

In addition, the subject Liquidation Agreement conforms to industry norms, as adjudicated by this Court in KSW Mech. Servs. v Johnson Controls, Inc., 992 F Supp. 2d 135 (E.D.N.Y. 2014), and by other Courts in the Federal and State jurisdictions in New York.

A liquidation agreement can take a number of forms, but its terms must be explicit. See, e.g. Barry, Bette & Led Duke Inc. v State of N.Y., 240 A.D. 2d 54, 57, 669 N.Y.S. 2d 741 (3d Dep't. 1998), leave denied, 92 N.Y. 2d 804, 700 N.E.2d 318, 677 N.Y.S.2d 779 (1998) (The liquidation agreement must be an expressed, not implied). Generally, also, liquidation agreement must concede liability, and provide for a pass through. These requirements are premised on the requirement that the intermediary or claimant party must suffer a loss in order to be able to assert a viable cause of action. See, Degnon Contracting Co. v New York, 235 N.Y. 481, 486 (1923) ("It would seem to be axiomatic that a suitor cannot recover damages for breach of a contract unless he has suffered them.") and in Federal cases: Severin v. United States, 99 Ct.Cl. 435 (Ct. Claim, 1943) and J. L. Simmons Company, Inc. v. the United States, 304 F.2d 886 (Ct. Cl. 1962).

More recent cases have stated that liquidating agreements require three (3) essential elements: "(1) the imposition of liability upon the [intermediary] for a [damaged party's] increased costs, thereby providing the [intermediate party] with a basis for legal action against the [responsible party], (2) a liquidation of liability in the amount of the [intermediary's] recovery against the [responsible party], and (3) a provision for the pass-through of that recovery to the [damaged party] . . ." Menorah Home & Hosp. for the Aged & Infirm v. Fireman's Fund Ins. Co., Index No. 04-CV-3172 (FB)(CLP), 2007 U.S. Dist. LEXIS 27684, 2007 WL 1109079, at p. 2-3, (E.D.N.Y. April 13, 2007).

Although the genesis of liquidation agreements come from a subcontractor's claims against the owner, there is no bar against contract based claims passing in the other direction and by or through other parties. The claims can pass from the owner through general contractor against the

subcontractor (referred to as "downstream" claims in cases such as <u>Travelers Cas. & Sur. Co. v Dormitory Auth.</u>, 735 F Supp. 2d 42, 70, (S.D.N.Y. 2010)) or from a subcontractor though the general contractor against the owner (conventional "upstream" claims, <u>Id.</u>). Generally, as stated by Judge Block in the <u>Menorah Home & Hosp. for the Aged & Infirm v Fireman's Fund Ins. Co.</u>, liquidation agreements can also be used in other situations, and the parties may vary: "[s]uch agreements concern three parties: (1) the damaged party, (2) the intermediary, and (3) the responsible party." 2007 US Dist LEXIS 27684, at p.5-6. In <u>Menorah Home & Hosp.</u> the liquidated claim was asserted by a surety acting on behalf of a general contractor, that had asserted a valid liquidated claim through the owner and against the owner's heat and air conditioning maintenance company. Judge Block in <u>Menorah Home</u> also analyzed another scenario in <u>North Moore Street Developers v. Meltzer/Mandl Architects, P.C.</u>, 23 A.D.3d 27, 799 N.Y.S.2d 485 (1st Dep't. 2005). There, the damaged party was the general contractor, the intermediary was the owner, and the responsible party was the architect. In all cases, the liquidation agreement was ruled valid and the liquidated claims were permitted.

Here, the Liquidation Agreement has the necessary elements of a confession of judgment, and a pass through of the recovery. In paragraph 2 of the Liquidation Agreement, Bo Steel conceded liability under the subcontract, and the parties liquidate that liability to what is recovered in this action.

## IV.    Summary

In sum, the subject Liquidation Agreement conforms to and satisfies the case law requirements cited above. And, if Mr. Babchik or his client is found to have standing to challenge such agreement - which he has not shown - Mr. Olazabal's prior testimony that he was authorized to sign construction contracts on Bo Steel's behalf, including the subcontract that was the basis of the Liquidation Agreement, should suffice to support his authority here to sign the Liquidation Agreement. And, to also serve as the undersigned counsel's basis for his appearance in this case on behalf of Bo Steel. Further, if disclosure of attorney-client communication is deemed necessary, I request that I be granted leave to provide such in camera and ex-parte.

Respectfully, the letter motion by Mr. Babchik is without merit and, as also joined in by plaintiff's counsel, it should be denied.

Respectfully submitted,

*Peter M. Kutil*

Peter M. Kutil

cc: All counsel (via ecf)

PMK:sas
Encls.